UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JEFFERY A. KEERAN,

        Petitioner,

v.  Case No. 05-C-0220

WILLIAM POLLARD,

        Respondent.

**DECISION AND ORDER**

On February 24, 2005, Petitioner Jeffery A. Keeran filed this petition pursuant to 28 U.S.C. § 2254, asserting that his state court conviction and sentence were imposed in violation of the Constitution. Keeran was convicted in Dane County Circuit Court of first-degree intentional homicide, armed robbery and burglary, all as a party to the crime.[1] He was sentenced to life imprisonment plus five years on the homicide count and to forty-year concurrent sentences on the armed robbery and burglary counts.

In his petition for federal habeas corpus, Keeran challenges only the constitutionality of his homicide conviction. Even as to that conviction, he does not deny that he participated in the beating that resulted in the death of Robert Hansen. Keeran claims, however, that his constitutional rights were violated when the trial court denied his request that the jury be instructed on the defense of coercion which, if found by the jury, could have resulted in a conviction of second-degree

---

[1] The homicide and burglary charges also carried an enhancer for use of a dangerous weapon. *See* Wis. Stat. § 939.63(1)(b).

intentional homicide. Keeran also claims that his attorney was ineffective in failing to introduce certain evidence in support of that defense. For the reasons that follow, the petition will be denied.

**BACKGROUND**

At trial, Keeran testified to the following version of events: on June 27, 1998, at approximately 6:00 p.m., Jon Barreau appeared at Keeran's house and told Keeran that they were going to Madison to rob someone. Keeran stated that he didn't want to go, but Barreau told him "you're going with me or whatever happens is happening to you." (Ex. I at 96:19-20.) Based on his past experience with Barreau, Keeran believed that "[h]e was either going to beat the shit out of me–beat me up, or he was going to do something to me." (Ex. I at 96:23-24.) Keeran testified that Barreau had told him that in the past Barreau had killed and robbed people, broken his sister's nose, poured hot water down his brother's back, and burned down a church and a house. (Ex. I at 97:3-7.) Keeran also testified that Barreau had hit him on approximately 100 occasions prior to June 27, including one time when Keeran's eye swelled up and he had double vision as a result. (Ex. I at 115:3-8; 116:21-23.) Barreau obtained two baseball bats from Keeran's garage, and ten to twenty minutes later petitioner and Barreau left for Madison in a car driven by Barreau's girlfriend. (Ex. I at 119-121.) They stopped briefly for gas, but Keeran remained in the car. On the way to Madison, Keeran stated that he didn't want to go, and Barreau looked back at him, smiled, and said, "You're going." (Ex. I at 123:3-9.)

When the car arrived in Madison, Barreau and Keeran each concealed a baseball bat in his pants leg and got out of the car. They then walked approximately two hours before reaching Hansen's house. During the walk, Keeran objected that he didn't want to continue, and Barreau

2

replied, "You're doing this." (Ex. I at 125:1-10.) At Hansen's house, Keeran waited while Barreau talked to Hansen for about 45 minutes. Keeran then went to the bathroom. When he came out, he saw Barreau hitting Hansen in the head with his baseball bat. Keeran was standing 20 to 24 feet away from Barreau. (Ex. I at 128:12-15.) As Barreau continued hitting Hansen, his bat broke to a length of 2 ½ - 3 feet. Barreau then told petitioner, "Hit him or I'm hitting you." (Ex. I at 131:1.) Petitioner hit Hansen twice in the head with his bat. He then went outside via the back door and threw up.

After 45 minutes, Barreau came out of the house carrying a lock box, the bats, and the items he and petitioner had touched. Barreau's girlfriend then drove Barreau and petitioner back to Monroe, stopping along the way so that Barreau could throw the bats and a knife he had used to stab the victim into a lake. Barreau opened the lock box. Inside he found a $20 bill, some gold-plated coins, and some envelopes. Barreau took the $20 bill and gave the coins to petitioner, who returned them to Barreau the next day.

Keeran was charged with violating Wis. Stat. § 940.01, which reads as follows:

(1) OFFENSES. (a) Except as provided in subsection (2), whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.

. . .

(2) MITIGATING CIRCUMSTANCES. The following are affirmative defenses to prosecution under this section which mitigate the offense to 2nd-degree intentional homicide under s. 940.05:

. . .

(d) *Coercion; necessity*. Death was caused in the exercise of a privilege under s. 939.45(1).

3

> (3) BURDEN OF PROOF. When the existence of an affirmative defense under sub. (2) has been placed in issue by the trial evidence, the state must prove beyond a reasonable doubt that the facts constituting the defense did not exist in order to sustain a finding of guilt under sub. (1).

Wis. Stat. § 939.45(1) refers to Wis. Stat. § 939.46, which reads as follows:

> A threat by a person other than the actor's coconspirator which causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm to the actor or another and which causes him or her so to act is a defense to a prosecution for any crime based on that act, except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide.

Petitioner was accused of violating Wis. Stat. § 940.01 as a party to the crime under Wis. Stat. § 939.05, which provides that:

> (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.
>
> (2) A person is concerned in the commission of the crime if the person:
>
> (a) Directly commits the crime; or
>
> (b) Intentionally aids and abets the commission of it; or
>
> (c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. Such a party is also concerned in the commission of any other crime which is committed in pursuance of the intended crime and which under the circumstances is a natural and probable consequence of the intended crime. This paragraph does not apply to a person who voluntarily changes his or her mind and no longer desires that the crime be committed and notifies the other parties concerned of his or her withdrawal within a reasonable time before the commission of the crime so as to allow the others also to withdraw.
>
> Keeran's defense rested on a theory of coercion. In addition to Keeran, the defense called

as witnesses Keeran's mother and two acquaintances who testified about Keeran's relationship with

4

Barreau.[2] Prior to the trial, a defense investigator had interviewed nine other potential witnesses. These individuals had knowledge of violent acts committed by Barreau. In some cases, their testimony would have corroborated Keeran's testimony that Barreau used violence against him, while in others the violence was directed at third parties and unknown to Keeran. However, Keeran's counsel did not call these witnesses because he believed that their testimony would not have been admitted by the trial court. Keeran's counsel also neglected to question the witnesses he called about certain violent acts committed by Barreau toward Keeran.

Prior to closing arguments, counsel discussed jury instructions with the court. Keeran's counsel requested a jury instruction on the defense of coercion, which, if successful, would reduce first-degree intentional homicide to second-degree intentional homicide. The court rejected the proposed instruction on the ground that the evidence presented by Keeran did not support it. Specifically, the trial court found that Keeran had not presented evidence sufficient to support a finding that beating Hanson was his only option:

> Keeran has failed, in my mind, to prove several elements of the coercion defense, the most obvious being the requirement that the person coerced must have a reasonable belief that committing the act was the only means of preventing the threat of death or great bodily harm. It is noted Mr. Keeran knew about the plan to rob Hansen or someone a few days before the event actually occurred. If in point of fact they were discussing Mr. Hansen, he could have warned Hansen, he could have notified the police, regardless of whether it was Mr. Hansen or another individual.
>
> Mr. Keeran and Mr. Barreau, according to the testimony, got out of the vehicle a few blocks away from the Hansen home; however, Mr. Keeran testifies that he and Barreau then walked around for a few hours before reaching the Hansen household. During that time, assuming the representation is accurate, Mr. Keeran could have walked away, he could have fled from Mr. Barreau and sought assistance.

---

[2]The defense also called Barreau, who invoked his Fifth Amendment right against self-incrimination.

5

> There's evidence that Keeran and Barreau spent approximately 45 minutes visiting with Hansen. There was ample opportunity for Keeran to make an excuse and simply leave the premises. He even could have warned Hansen when Hansen opened the door to his home.
>
> Once the beating of Hansen started Keeran could have simply refused to assist Barreau. At that moment in time Barreau's baseball bat was broken, and Barreau held no other weapons. Keeran could have tried to dissuade Barreau from further violence. He could have fled the house. Barreau's alleged threat could just as easily be interpreted as a future threat, one that Keeran could have avoided by going to the appropriate authorities. Any of these possible alternatives provide a more reasonable means of preventing the harm than simply going along with the plan. Even viewing the evidence in the light most favorable to Mr. Keeran, there is no reasonable basis in the evidence to show that Keeran acted under a belief that his actions were necessary to prevent either imminent death or great bodily harm to himself. . . .

(Ex. J at 47.) Without the coercion defense,[3] Keeran's counsel fell back on arguing that the jury should acquit Keeran of first-degree intentional homicide because he lacked intent. The jury convicted Keeran on all counts.

Following his conviction, Keeran moved for post-conviction relief on the bases of ineffective assistance of counsel and trial court error. Regarding the latter, Keeran claimed that the trial court had invaded the province of the jury and infringed upon his Sixth Amendment rights by denying him a coercion instruction. Keeran also claimed that the court's "holding" that he and Barreau were co-conspirators was erroneous under state law. The trial court declined to reconsider its alleged holding on whether Keeran and Barreau were co-conspirators, explaining that

> the court's decision not to submit the coercion instruction was not based solely on a determination that the coercive threats were made by a "co-conspirator." The court's decision was grounded primarily in the conclusion that Keeran had failed to present sufficient evidence demonstrating both the reasonableness of his belief that

---

[3]The trial court also denied a request for an instruction on felony murder, for substantially the same reasons that it denied the coercion instruction. (Ex. J at 53-54). Petitioner does not challenge the denial of the felony murder instruction here.

committing the crime was the *only* means of preventing imminent harm and the *imminence* of the harm.

(App. B at 7; emphasis in original.) The trial court also rejected Keeran's ineffective assistance of counsel claim, which arose out of counsel's failure to call additional witnesses and properly to question those he called. The court held that much of the potential testimony would have been inadmissible and that what was admissible would not have had a reasonable probability of changing the outcome of the trial. (App. B at 21.)

After denying his post-conviction motions, the trial court sentenced Keeran to life plus five years on the homicide count and forty-year concurrent sentences on the armed robbery and burglary counts. Keeran appealed his conviction to the Wisconsin Court of Appeals, which affirmed. The court of appeals first explained the burden that a defendant must overcome to obtain a jury instruction on coercion:

> A defendant seeking a coercion defense instruction must meet the initial burden of producing evidence to support such an instruction. *See State v. Stoehr*, 134 Wis. 2d 66, 87, 396 N.W.2d 177 (1986). A defendant is entitled to a coercion defense instruction if . . . the defense is supported by sufficient evidence.[] *State v. Coleman*, 206 Wis. 2d 199, 212-13, 556 N.W.2d 701 (1996) (citations omitted). . . . [E]vidence is sufficient if a reasonable construction of the evidence, viewed in a light most favorable to the accused, supports the defendant's theory. *Id*. at 213.

*State v. Keeran*, 674 N.W.2d 570, 573 (Wis. Ct. App. 2003). The court then explained why the instruction was inappropriate in Keeran's case:

> To gain entitlement to a coercion defense instruction, Keeran needed to provide details explaining why his only means of preventing Barreau from inflicting on Keeran "imminent" death or great bodily harm was to participate in the crimes. However, such details are lacking. There is no explanation as to why, prior to leaving Monroe for Madison, Keeran could not have gone into his home and telephoned the police or run out the back door; no explanation as to why Keeran could not have excused himself to use the bathroom at the gasoline station and then

7

taken refuge in that station with witnesses present;[4] no explanation as to why Keeran could not have fled the car at a busy intersection in Madison; and no explanation as to why Keeran could not have fled from Barreau while walking for two hours. Was Barreau faster or stronger than Keeran? Keeran did not assert either.[5]

The lack of details similarly defeats Keeran's assertion that he had no alternative when Barreau directed him to hit Hansen. Keeran does not explain why he could not have run out the back door of Hansen's house or why he could not have used his unbroken bat to fend off Barreau while otherwise leaving the house. Was something blocking Keeran's exit? Keeran points to no such evidence. Keeran did not explain to the jury why, at the moment he stood watching at a distance of about twenty feet with an unbroken bat in his hands, he had no choice but to strike Hansen.

Moreover, Keeran did not take the most obvious step to avoid hitting Hansen: he did not tell Barreau that he did not want to hit Hansen, that he would not hit Hansen, or that it was unnecessary that he hit Hansen because Hansen was obviously already at Barreau's mercy. It might be that such an attempt would have produced yet another threat from Barreau, but the point is that Keeran did not even try. Instead, by his own testimony, Keeran simply complied with Barreau's directive.

Keeran testified that he was afraid of Barreau and, viewing the evidence in a light most favorable to Keeran, the evidence supports a finding that Keeran reasonably believed that Barreau would attempt to harm Keeran if Keeran did not comply with Barreau's orders. But that only suggests that Keeran's safest course was to comply with Barreau's orders; it does not mean that Keeran's only course was to comply with Barreau's orders. The coercion defense is not a license to take the safest course. Further, viewing the evidence in a light most favorable to Keeran, the evidence supports a finding that Keeran reasonably believed that if he successfully managed to separate himself from Barreau, Barreau would attempt to hunt Keeran down and harm him later. But such a finding would not support a coercion defense because the defense requires the prevention of "imminent" death or great bodily harm.

Therefore, the trial court properly declined to instruct Keeran's jury on coercion.

*Id.* at 574-575. The court also held that none of the evidence Keeran faulted his trial counsel for

---

[4] Were no people present at the gasoline station? Keeran did not say. (Footnote in original.)

[5] Keeran testified that Barreau was one year older than Keeran and that they were about the same size. (Footnote in original.)

8

failing to present would have entitled him to a coercion instruction had it been presented. *Id.* at 575-576. The Wisconsin Supreme Court denied review. (Ex. F.)

**ANALYSIS**

A federal court may grant a writ of habeas corpus in favor of a prisoner serving a sentence for a state crime only if petitioner demonstrates that the adjudication of his case in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" established Supreme Court precedent when the court applies a rule different from governing Supreme Court cases or confronts a set of facts that is materially indistinguishable from those of a Supreme Court decision and arrives at a different conclusion. *Williams v. Taylor,* 529 U.S. 362 (2000). If the case involves an application of Supreme Court precedent, this court must defer to reasonable state court decisions and cannot grant the writ unless the state court's decision was objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

What constitutes an objectively unreasonable application of clearly established federal law can be difficult to determine. An unreasonable application of federal law, the Court has said, is not the same as one that is, in the view of the reviewing court, incorrect. *Id.* Nor is an unreasonable application one that reasonable jurists would all necessarily agree is unreasonable. *Williams*, 529 U.S. at 409. To meet the unreasonable application standard, the decision of the state court must be more than clearly erroneous, *Lockyer v. Andrade*, 538 U.S. 63, 75-6 (2003); it must fall "well

9

outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

Finally, a state court's findings of fact are presumed correct. *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir.1999). The reasonableness of these findings can be overcome only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Keeran first argues that the Wisconsin courts denied him due process of law by refusing his request for an instruction on coercion. The Seventh Circuit has cautioned that "[i]n general, the failure of a state trial court to instruct the jury on a lesser offense does not implicate a federal constitutional question and will not be considered in a federal habeas corpus proceeding." *Reeves v. Battles*, 272 F.3d 918, 920 (7th Cir. 2001). The *Reeves* Court also noted, however, that "the omission of an instruction regarding a particular offense may effectively result in a directed verdict, thereby implicating Sixth and Fourteenth Amendment rights." *Id.* When the issue is raised in a federal habeas proceeding, the court held, "the question is not whether the failure to instruct on a lesser included offense was correct or incorrect under state law, but rather whether failure to do so constituted a defect so fundamental that it results in a complete miscarriage of justice or omission inconsistent with the standards of fair procedure." *Id.* "[T]he complete failure to give any jury instruction on an essential element of the offense charged, under circumstances indicating that the jury was not otherwise informed of the necessity of proof of the element, is a violation of due process." *Cole v. Young*, 817 F.2d 412, 423 (7th Cir. 1987).

Keeran claims that two federal cases entitle him to relief. He first cites *Beck v. Alabama*, 447 U.S. 625 (1980), in which the Supreme Court held that the failure to charge a lesser included non-capital offenses where the evidence warrants such a charge is a denial of due process. *Beck*,

10

of course, was a capital case, and the court acknowledged that "there is a significant constitutional difference between the death penalty and lesser punishments." *Id.* at 637. *Beck* expressly left open the question of whether the Due Process would require giving such instructions in non-capital cases. *Id.* at 638 n. 14. More importantly, in *Beck* it was undisputed that the evidence presented at trial was sufficient to allow acquittal on the more serious charge and conviction on the lesser. At issue in *Beck* was the constitutionality of a state statute that prohibited the trial court from submitting a lesser included offense to the jury in a capital case, even when the evidence supported such a verdict. *Id.* at 625. Here, by contrast, there was no statute prohibiting the trial court from submitting the lesser included offense; instead, both the trial court and the Wisconsin Court of Appeals, applying state law, held that the evidence did not support an instruction on the defense of coercion. *Beck* does not address this issue.

Keeran also cites *Sanders v. Cotton*, 398 F.3d 572 (7th Cir. 2005), a non-capital case in which the Seventh Circuit[6] held that an Indiana court violated clearly established federal law when it failed to properly instruct the jury on the prosecution's burden to prove the absence of "sudden heat" beyond a reasonable doubt. *Sanders* is clearly distinguishable from this case, however, because in *Sanders* the trial court concluded that the evidence supported the defense that the defendant was acting under the heat of passion, but failed to properly instruct the jury as to which party bore the burden of proof with respect to that defense. *Id.* at 577. Here, by contrast, the trial

---

[6]*Sanders* is not, by itself, " clearly established Federal law, as determined by the Supreme Court of the United States." The court will, however, treat *Sanders* as an application of *In re Winship*, 397 U.S. 358 (1970), from which the *Sanders* court derived the proposition that "the Due Process clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 581 (quoting *In re Winship*, 397 U.S. at 364).

11

court, applying Wisconsin law, concluded that even assuming petitioner's testimony was true, it did not support an instruction on the defense of coercion because his own account was insufficient to support a finding that his own death or great bodily harm was imminent. This isn't a case of a state court improperly shifting the burden of proof to a defendant on an essential element of a crime; this is a case of a state court applying its own law. There is no "clearly established federal law" that addresses this issue.

The Seventh Circuit's holding in *Sanders* was a straightforward application of *Mullaney v. Wilbur*, 421 U.S. 684 (1975), in which the Supreme Court held that due process "requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion or sudden provocation when the issue is properly presented in a homicide case." *Sanders*, 398 F.3d at 581 (quoting *Mullaney*, 421 U.S. at 704 (1975)). This case, by contrast, does not involve the presence or absence of the heat of passion or sudden provocation–the traditional dividing line between murder and manslaughter. Rather, it involves coercion–a defense to murder not even available in some jurisdictions. *See, e.g., United States v. LaFleur*, 971 F.2d 200, 206 (9th Cir. 1991) (holding duress not a defense to first degree murder, nor does it mitigate murder to voluntary manslaughter); *Hembrick v. Commonwealth*, 2002 Va. App. LEXIS 752, at *17 (Va. Ct. App. Dec. 17, 2002) ("Duress . . . is generally not available as a defense to murder. One ought rather to die himself than escape by the murder of an innocent."(internal citations omitted)). And as construed by the Wisconsin courts, the defense of coercion is limited to the "most severe form of inducement. It requires an additional finding, under the objective-reasonable man test, with regard to the reasonableness of the actor's beliefs that he is threatened with immediate death or great bodily harm with no possible escape other than the commission of a criminal act." *State v. Amundson*, 230

12

N.W.2d 775, 783 (Wis. 1975). Wisconsin law is also clear that the defense is not allowed when the source of the alleged threat is the defendant's co-conspirator.

Given the absence of federal law on the issue, I cannot say that the decisions of the Wisconsin courts are contrary to or represent an unreasonable application of that law. The decisions reflect a thorough consideration of Keeran's own testimony regarding the threat he faced from the time Barreau first told him they were going to rob someone to the time Keeran struck Hanson with the baseball bat in his home. The Wisconsin courts concluded from his testimony that no reasonable jury could conclude that Keeran had no other choice but to carry out the orders Barreau had allegedly given him. This conclusion was not unreasonable in light of the length of time that expired after Barreau announced the plan to commit the robbery and the journey they took to Hanson's house. Keeran offered no explanation of why he could not have escaped either when they stopped for gas at a public gas station or as they walked the public streets of Madison for two hours. There is no suggestion that Barreau was carrying a gun, and while he may have been a violent person, there was no evidence that he was disposed to beat a person to death on a public street in broad daylight. Even when he emerged from the bathroom off of the kitchen at Hanson's home and saw what Barreau had done, the evidence demonstrates that Barreau was more than twenty feet away in the living room at the front of the house. Keeran offered no reason why he did not then flea out the back door as he apparently did after he struck Hanson with his baseball bat in order to throw up. On this record I find no basis for federal relief on Keeran's claim that he was denied due process.

Keeran's remaining argument is that trial counsel rendered ineffective assistance by failing to call witnesses who could corroborate his testimony that Barreau engaged in violent and

13

controlling behavior toward him, and in failing adequately to question those witnesses he did call.[7]
In order to show ineffective assistance of counsel Keeran must show that counsel's representation was deficient, i.e., that it fell below an objective standard of reasonableness, and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The performance standard gives a wide latitude of permissible attorney conduct, and a prisoner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotation marks deleted); *see also Washington v. Smith*, 219 F.3d 620, 627 (7th Cir. 2000). If the prisoner has identified specific omissions, the court must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Once the prisoner establishes his counsel's ineffectiveness, he must still demonstrate prejudice. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Id*. at 697. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice that course should be followed. *Id*.

---

[7]Respondent argues that as to his ineffective assistance of counsel claim, Keeran has failed to exhaust his state court remedies because he did not include it in his petition for review filed in the Wisconsin Supreme Court. While the petition for review does not explicitly allege the trial counsel's representation was constitutionally deficient, it does refer to counsel's admitted misunderstanding of the trial court's ruling and his concession that his failure to make a formal offer of proof was unintentional. (Pet. for Rev. at 13.) Is this sufficient to show "fair presentment"? Rather than decide this more difficult issue, I will proceed to the merits and deny the claim on that basis. *See* 28 U.S.C. § 2254(b)(2).

14

As the Wisconsin Court of Appeals explained, the evidence that Keeran's trial counsel failed to offer does nothing to rebut the reasons given by the trial court and the court of appeals for concluding that Keeran was not entitled to an instruction on coercion. The ruling of the state courts was based on Keeran's own testimony. The testimony of other witnesses would not have changed his own. Accordingly, Keeran cannot show that counsel's failure to offer the evidence at trial prejudiced him.

## CONCLUSION

Petitioner has failed to establish that his conviction and sentence for first-degree intentional homicide were imposed in violation of his federal rights. Accordingly, his petition for a writ of habeas corpus **DENIED** and this case is **DISMISSED.**

**SO ORDERED.**

Dated this __14th__ day of December, 2005.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge